UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: _____

SETAR N.V.

      Plaintiff,

v.

EGBERT YVAN FERDINAND KOOLMAN,
individually; 3DK CONSULTING CORP., a foreign
corporation; EVARINA XIOMARA DEBORAH
KOOLMAN-HART, individually; AIZA SONALY
KARENZA CROES-ACOSTA, individually; ITECH
SOLUTIONS GROUP, INC., a Florida corporation;
TTX GLOBAL, LLC, a Florida limited liability
company; ISKY WIRELESS GROUP, LLC, a Florida
limited liability company; PACIFIC
TECHNOLOGIES, LLC, a Florida limited liability
company; QUANTUM WIRELESS
TECHNOLOGIES, LLC, a Florida limited liability
company; GSMCITY SUPERCENTER LLC, a
Florida limited liability company; I-GSM GROUP
LLC, a Florida limited liability company;
LAWRENCE WAYNE PARKER, JR. a/k/a LARRY
PARKER, individually; HILBIANE MORENO,
individually; MAX RIVADENEIRA, individually;
LORENA LUGO a/k/a LORENA RIVADENEIRA,
individually; PINFU GROUP LTD., a foreign entity;
GLISSCOM MOBILE PHONES, a foreign entity;
BENGO MOBILE LLC, a Florida limited liability
company; SMARTONE TECHNOLOGY LLC, a
Florida limited liability company; FELLOW
TRADING LTD., a foreign entity; PINFU
OVERSEAS TRADING LTD., a foreign entity;
GIDEON CHONG, individually; YOCK PIN
CHONG a/k/a MESCHACH CHONG, individually;
FU CHUEN CHOW a/k/a RAYMOND CHOW,
individually; CHUNG-WEN WU a/k/a BENNY WU,
individually; and SHU-HUI LEE a/k/a MEGAN LEE,
individually.

      Defendants.

_____/

BROAD AND CASSEL LLP
One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

## COMPLAINT

Plaintiff SETAR N.V., a foreign corporation, hereby sues Defendants EGBERT YVAN FERDINAND KOOLMAN, individually; 3DK CONSULTING CORP., a foreign corporation; EVARINA XIOMARA DEBORAH KOOLMAN-HART, individually; AIZA SONALY KARENZA CROES-ACOSTA, individually; ITECH SOLUTIONS GROUP, INC., a Florida corporation; TTX GLOBAL, LLC, a Florida limited liability company; ISKY WIRELESS GROUP, LLC, a Florida limited liability company; PACIFIC TECHNOLOGIES, LLC, a Florida limited liability company; QUANTUM WIRELESS TECHNOLOGIES, LLC, a Florida limited liability company; GSMCITY SUPERCENTER LLC, a Florida limited liability company; I-GSM GROUP LLC, a Florida limited liability company; LAWRENCE WAYNE PARKER, JR. a/k/a LARRY PARKER, individually; HILBIANE MORENO, individually; MAX RIVADENEIRA, individually; LORENA LUGO a/k/a LORENA RIVADENEIRA, individually; PINFU GROUP LTC., a foreign entity; GLISSCOM MOBILE PHONES, a foreign entity; BENGO MOBILE LLC, a Florida limited liability company; SMARTONE TECHNOLOGY LLC, a Florida limited liability company; FELLOW TRADING LTC., a foreign entity; PINFU OVERSEAS TRADING LTC., a foreign entity; GIDEON CHONG, individually; YOCK PIN CHONG a/k/a MESCHACH CHONG, individually; FU CHUEN CHOW a/k/a RAYMOND CHOW, individually; CHUNG-WEN WU a/k/a BENNY WU, individually; and SHU-HUI LEE a/k/a MEGAN LEE, individually, alleging:

## PRELIMINARY STATEMENT

1.      This case arises from Egbert Yvan Ferdinand Koolman's orchestration, oversight and direction of a more than decade-long scheme of anti-competitive and racketeering activity. At all relevant times, his and others' objective was the theft of more than $15 million from Setar

2

N.V. through a scheme of illegal kickbacks and improperly obtained compensation, revenues and profits on mobile phone equipment purchase contracts run through a web of secretly related companies.

     2.    Each of the Defendants needed, and in fact depended on, the participation of the others to accomplish their common purpose of fraud and deceit for financial gain. Prior to being terminated for cause in August 2016, Koolman was in charge of procurement of cellular phones and other mobile equipment for Setar – a privatized full telecommunications service provider for the island of Aruba. The other Defendants were either Setar's suppliers or principals of Setar's suppliers from at least 2005 through 2016. During that more than ten-year period, Koolman repeatedly and systematically abused his position with Setar by manipulating the procurement process to steer business to his co-conspirators, who would reward Koolman and others with millions of dollars in kickbacks, and who themselves were awarded millions of dollars in ill-gotten purchase contracts on mobile phone equipment. The Defendants' illicit scheme of kickbacks, commercial bribery, bid-rigging and price-fixing was anti-competitive, and it was a quintessentially symbiotic illegal racketeering enterprise. All told, their individual and collective misconduct over a more than ten year period cost Setar tens of millions of dollars.

## PARTIES

### The Company

     3.    Plaintiff Setar N.V. ("Setar," the "Company," or "Plaintiff") is a foreign corporation organized under the laws of Aruba. Setar is the privatized full telecommunications service provider for the island of Aruba. The Company provides telephone, internet, and GSM-related wireless services to consumers and other end-users.

BROAD AND CASSEL LLP
One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

4.     Until 2003, Setar was the telecommunications division of the Aruban Government, and considered a utility. Strategic decisions for Setar were made by the Minister of Telecommunications (the "Minister"), and all business-related decisions, such as hiring, marketing, and competitive issues, also were directed by the Minister.

5.     In 2003, while Setar remained 100% owned by the Aruban Government, its reporting and leadership structure changed. A Board was formed and a Director named. From that point forward, all employees reported to the Board and/or the Director. The Minister no longer had a role in the management or day-to-day operations of the Company. Hiring, purchasing, distribution, competitive issues and business strategy and positioning were handled by the Board and the Director. Profits, however, would continue to flow to the Aruban Government.

### Koolman Defendants

6.     Defendant Egbert Yvan Ferdinand Koolman ("Koolman") was born in Aruba and is currently a citizen of and is residing in Miami-Dade County, Florida, and is *sui juris*.

7.     Defendant Evarina Xiomara Deborah Koolman-Hart ("Debbie Koolman") is a resident and citizen of Aruba, and is *sui juris*. Debbie Koolman is the ex-wife of Koolman, having divorced him in the summer of 2016. Until recently, Debbie Koolman was employed by the Central Bank of Aruba, overseeing foreign currency exchange between that bank and Aruba's Foreign Exchange Commission.

8.     Defendant 3DK Consulting Corp. ("3DK") is a corporation organized under the laws of the British Virgin Islands in 2006. 3DK has always had only four listed principals: Koolman, Debbie Koolman, and the former couple's two children.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

9.     Defendant Aiza Sonaly Karenza Croes-Acosta ("Aiza Croes") is a resident and citizen of Aruba, and is *sui juris*. Aiza Croes is believed to have shared a romantic relationship with Koolman.

10.     Defendants Koolman, Debbie Koolman, 3DK, and Aiza Croes are referred to collectively as the "Koolman Defendants."

### Parker/Rivadeneira Defendants

11.     Defendant ITech Solutions Group, Inc. ("ITech") is a domestic corporation organized under the laws of the State of Florida in 2005 by Vilma J. Leandro ("Leandro") and Dolores Gonzalez. Leandro is the mother of Defendant Lawrence "Larry" Wayne Parker, Jr., and is believed to be a straw or nominee owner of ITech.

12.     Defendant TTX Global, LLC ("TTX") is a limited liability company organized under the laws of the State of Florida in 2007 by Elvira Silva ("Silva"). In 2009, corporate records for TTX reflect that Silva was replaced by Defendant Lorena Lugo, who, at that time, was the wife of Defendant Max Rivadeneira.

13.     Defendant ISky Wireless Group LLC ("ISky") is a limited liability company organized under the laws of the State of Florida in 2010 by Defendant Lawrence "Larry" Wayne Parker, Jr.

14.     Defendant Pacific Technologies, LLC ("Pacific") is a limited liability company organized under the laws of the State of Florida in 2013 by Defendant Hilbiane Moreno. Hilbiane Moreno was, at the time, the wife of Defendant Lawrence "Larry" Wayne Parker, Jr.

15.     Defendant Quantum Wireless Technologies, LLC ("Quantum") is a limited liability company organized under the laws of the State of Florida in 2011 by Defendant Lawrence "Larry" Wayne Parker, Jr.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

16.     Defendant GSMCity Supercenter LLC ("GSMCity") is a limited liability company organized under the laws of the State of Florida in 2011.

17.     Defendant I-GSM Group LLC ("I-GSM") is a limited liability company organized under the laws of the State of Florida in 2012 by Shamin Azad and Defendant Lawrence "Larry" Wayne Parker, Jr.

18.     Defendant Lawrence "Larry" Wayne Parker, Jr. ("Parker") is a resident and citizen of Miami-Dade County, Florida, and is *sui juris*. Parker was the Registered Agent and officer of Defendants ISky, Quantum, and I-GSM. Parker also is affiliated with ITech through his mother, Leandro, who is named as managing member in what, again, is believed to be a straw or nominee capacity.

19.     Defendant Hilbiane Moreno ("Moreno") is a resident and citizen of Miami-Dade County, Florida, and is *sui juris*. Moreno is the wife of Defendant Parker and is a principal of Quantum and ISky.

20.     Defendant Max Rivadeneira ("Rivadeneira") is a resident and citizen of Miami-Dade County, Florida, and is *sui juris*. Rivadeneira was an officer and principal of Defendants ITech and TTX, who also had affiliations with other, former suppliers of Setar who are not named defendants in this lawsuit. For example, Rivadeneira was a Senior Purchasing Manager with CT Miami from 2002 to 2007, was affiliated with CWW-USA in 2006, and was a Director of the Latin American business for Brightstar from 2007 to 2009. All three Miami-based companies were vendors to Setar, and they collectively (and previously) sold to Setar over $23 million in mobile phones and other related equipment.

21.     Defendant Lorena Lugo a/k/a Lorena Rivadeneira ("Lugo") is a resident and citizen of Miami-Dade County, Florida, and is *sui juris*. Lugo is the ex-wife of Defendant

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

Rivadeneira. Lugo also was the Registered Agent of TTX and was listed as its principal at the time of its dissolution in 2012.

22.     Defendants ITech, TTX, ISky, Pacific, GSMCity, I-GSM, Quantum, Parker, Moreno, Rivadeneira, and Lugo are referred to collectively as the "Parker/Rivadeneira Defendants."

### Pinfu Defendants

23.     Defendant Pinfu Group Ltd ("Pinfu Group") is an entity organized under the laws of China in 2011 and owned by Defendant Yock-Pin (Meshach) Chong. Defendant Fu Chuen (Raymond) Chow was a director of Pinfu Group.

24.     Defendant Glisscom Mobile Phones ("Glisscom") is an entity organized under the laws of the Netherlands in 2010. Defendant Gideon Chong owns Glisscom.

25.     Defendant Bengo Mobile LLC ("Bengo Mobile") is a limited liability company organized under the laws of the State of Florida in 2010. Defendants Gideon Chong and Chung-Wen (Benny) Wu were the operating members.

26.     Defendant Smartone Technology LLC ("Smartone") is a limited liability company organized under the laws of the State of Florida in 2013 by Defendant Shu Hui (Megan) Lee, who is currently its Manager and Registered Agent. Defendant Chung-Wen (Benny) Wu is also listed as a contact person in company documents.

27.     Defendant Fellow Trading Company Ltd. ("Fellow Trading") is a company organized under the laws of Taiwan in 1966.

28.     Defendant Pinfu Overseas Trading Ltd. ("Overseas Trading") is a company organized under the laws of China in 2007. Defendant Yock Pin (Meschach) Chong owned Overseas Trading, along with his wife, until its dissolution on January 17, 2014.

BROAD AND CASSEL LLP
One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

29.     Defendant Gideon Chong ("G. Chong") is a Chinese citizen and resident of the Netherlands, and is *sui juris*. G. Chong is a principal of Bengo Mobile and Glisscom. G. Chong is the son of Defendant Yock Pin (Meschach) Chong.

30.      Defendant Yock Pin (Meschach) Chong ("M. Chong") is a resident and citizen of China, and is *sui juris*. M. Chong is a principal of Pinfu Overseas and Pinfu Group.  M. Chong is the father of G. Chong.

31.     Defendant Fu Chuen (Raymond) Chow ("R. Chow") is a resident and citizen of China, and is *sui juris*. R. Chow is a principal of Pinfu Group and Fellow Trading.

32.     Defendant Chung-Wen (Benny) Wu ("B. Wu") is a resident and citizen of Miami-Dade County, Florida and is *sui juris*. B. Wu is a principal of Bengo Mobile and Fellow Trading. B. Wu is the husband of Defendant Shu-Hui (Megan) Lee, and is believed to be the uncle of G. Chong.

33.     Defendant Shu-Hui (Megan) Lee ("M. Lee") is a resident and citizen of Miami-Dade County, Florida, and is *sui juris*. M. Lee is the wife of B. Wu and a principal of Smartone and Fellow Trading.

34.     Defendants Pinfu Group, Glisscom, Bengo Mobile, Smartone, Fellow Trading, Overseas Trading, G. Chong, M. Chong, R. Chow, B. Wu and M. Lee are referred to collectively as the "Pinfu Defendants."

35.     The Koolman Defendants, the Parker/Rivadeneira Defendants, and the Pinfu Defendants are referred to collectively as the "Defendants," the "Anti-Competitive Defendants," or the "Racketeering Defendants."

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over the claims brought under 15 U.S.C. § 1 *et seq*. the "Sherman Act"), brought pursuant to 15 U.S.C. § 15(a) (the "Clayton Act"); 15 U.S.C. § 13(c) (the "Robinson-Patman Act"), brought pursuant to the Clayton Act; and 18 U.S.C. § 1961 *et seq*. ("RICO"), all under 28 U.S.C. § 1331 because they arise under the laws of the United States. This Court has jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiff's antitrust and RICO claims as to form part of the same case and controversy.

37.     Personal jurisdiction exists over the Defendants because they, through their anti-competitive practices and racketeering activities, have committed criminal and tortious acts in this State, and committed criminal and tortious acts targeted into this State and interstate commerce and which caused injury to the Plaintiff within this State and interstate commerce related to its business conducted in the United States and this State. The Defendants have directed the acts at the heart of this dispute toward the State of Florida and the Southern District of Florida, and have utilized instrumentalities located in the State of Florida and the Southern District of Florida to carry out the acts alleged in this Complaint, all of which have damaged Plaintiff in the State of Florida and the Southern District of Florida.

38.     Personal jurisdiction exists over the non-resident Defendants pursuant to Section 48.193(1)(a)(2), Florida Statutes because they, through their participation in the anti-competitive practices and criminal racketeering enterprise at issue in this Complaint, committed tortious acts within the State of Florida and the Southern District of Florida, and exhibit sufficient minimum contacts with the State of Florida and the Southern District of Florida such that their being subject to personal jurisdiction in this district satisfies traditional notions of fair play and

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

substantial justice. The non-resident Defendants' contacts with the State of Florida and the Southern District of Florida directly relate to the criminal racketeering enterprise at issue in this Complaint and were carried out purposefully to such a degree that the non-resident Defendants should reasonably anticipate being haled into Court in the State of Florida and in the Southern District of Florida in particular.

39.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and, under 28 U.S.C. § 1391(c), because the Defendants are subject to personal jurisdiction in this judicial district.

40.     All conditions precedent to the filing and maintenance of this action have been performed, have occurred or have been waived prior to the commencement of this action.

## GENERAL ALLEGATIONS

### Background of Koolman's Employment with Setar

41.     Koolman first began working for Setar in August 1995 in the company's marketing department.

42.     In 2003, Koolman was promoted to Product Manager.  In that role, Koolman was responsible for overseeing all mobile device and accessory purchases for the Company. Unfortunately, this personnel move would provide Koolman with the access and authority necessary to orchestrate and develop an ongoing criminal anticompetitive and racketeering enterprise with his co-Defendants to defraud and divest Setar out of millions of dollars.

43.     Koolman ultimately was terminated for cause in August 2016 after Setar first began to learn of the massive criminal enterprise by Koolman and his co-Defendants.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

<u>**Relevant Setar Employment Policies and Procedures**</u>

44.     At all times relevant, Setar had various policies and procedures in place regarding the expected conduct of its employees.

45.     To that end, and among other things, Setar employees are obligated to represent the Company's interests and comply with its code of conduct and its rules and regulations.

46.     Employees likewise are expected to maintain as confidential all of Setar's business information, including information provided to Setar by third parties like its vendors and suppliers, who routinely share confidential pricing and product information in their respective bids to win purchase contracts with Setar.

47.     Employees also are prohibited from accepting other employment or engaging in other business ventures without the prior written consent of Setar's Director. If an employee wants to work for another employer or accept a second job, he or she always first must obtain the written approval of Setar's management. Any other or additional job cannot interfere with, or affect, the Setar employee's work, and he or she must continue abiding by all rules established by the Company. Failure to comply with these requirements can subject an employee to immediate termination.

48.     Finally, employees are prohibited from participating in any entity, institution, company or business that performs activities competitive with, or similar to, Setar's, whether or not remuneration is involved.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

## **Koolman's Duties and Obligations as Product Manager**

49.     As Product Manager, and among other things, Koolman was to ensure that he always received an "MTU" from the marketing department, backing up each order that he ultimately placed for services or products on behalf of Setar.[1]

50.     For each such request for services or products, Koolman was required to obtain a **minimum** of two (2) price quotations from at least two **independent** Setar suppliers. If only one price quotation was obtained, Setar required that a detailed explanation justifying the deviation from the standard procedure be provided to the Sector Manager.

51.     All quotation requests to potential suppliers were to be submitted in writing and at the same time. Each request was to contain a description of the product or service required and a deadline for submissions of all requests or bids. Purchases or procurements for products or services valued at more than approximately $2,500.00 required an additional letter to Setar's Director, again detailing the need for the product or service and the justification for the price quoted.

52.     For all MTUs, Setar required the spaces for "Reason for Purchase" and "Post Number" to be completed. Again, deviations from these procedures required a showing that a departure was necessary to avoid major damage to the Company or a loss in the continuity of Setar's business.

53.     The point of these and other procedures was to ensure that Setar received multiple, fair and competitive bids from independent suppliers and vendors, resulting in the best price available for Setar's purchases of phones and mobile accessories.

---

[1] The term "MTU" is a Dutch acronym for a document that essentially is a proposal to request bids from a vendor or supplier to Setar to meet a specific product or equipment need.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

**Setar's Product Policies**

54.    Setar, as a general practice, did not deal in used, pre-owned, or refurbished phones. Instead, all phones and equipment purchased by Setar for sale or distribution to end users or otherwise were to be new and defect-free.

55.    If any used, pre-owned, refurbished or defective phones or mobile equipment were received from a particular vendor or supplier, they were to be returned to the supplying vendor and Setar was to receive a credit from the offending vendor to defray the associated replacement costs.

56.    In a normal scenario, Setar would cease doing business with any vendor or supplier found to have sold Setar used, pre-owned, refurbished, defective or faulty mobile phones or other mobile equipment, particularly if it occurred on more than one occasion or if the problem was widespread or egregious in a single order.

**The Panama Papers and Koolman's Dismissal from Setar**

57.    After the Panama Papers became public in 2015, Setar's Board and Director independently learned that a "Koolman" who had been linked in the Panama Papers to Defendant 3DK Consulting Corp was, in fact, the same Koolman that Setar employed as its Product Manager.[2] In a subsequent meeting with Setar representatives on May 3, 2016, Koolman finally admitted to his involvement with 3DK, but his admission was limited and highly misleading. Koolman admitted to Setar representatives that he had established 3DK with an unnamed business partner, but he also told them the company had been inactive for the past three (3) years

---

[2] The Panama Papers are 11.5 million leaked documents that detail financial and attorney-client information for more than 200,000 off-shore entities, many of which, the documents disclosed, were being used for illegal purposes, including fraud, tax evasion and evading international diplomatic sanctions.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

and never got as far as opening a business bank account. In Koolman's words, 3DK "never got off the ground."

58.     Importantly, this was the first instance in which Koolman had ever mentioned anything to Setar about 3DK, despite the fact that 3DK had existed for roughly a decade and apparently with little regard for the obvious conflicts of interest it presented for his continued employment with Setar. More importantly, Koolman's disclosure was a lie.

59.     Upon further investigation, Setar discovered that Defendant 3DK was still active; that Koolman was a principal in the company; and that Koolman, despite his assurances to the contrary, established not one but **two** bank accounts for 3DK with Credicorp Bank in Panama.

60.     Before a scheduled interview with Setar's representatives on July 14, 2016, Koolman advised that he no longer would cooperate with the Company's investigation of his recent disclosure and activities at Setar.

61.     However, roughly a month later on August 15, 2016, Koolman admitted in a meeting with Company representatives that he knew that two or more of Setar's suppliers were controlled by the Chong family, but did not report this to Setar management.

62.     This common control of companies Koolman presented to Setar as "independent" suppliers not only was against Setar's procurement policies and procedures, it also raised grave questions about Koolman's forthrightness and fueled intense concern over his ability to discharge his duties as Product Manager free from conflicts of interest or improper influence.

63.     Setar's then-to-date investigation also revealed more misconduct by Koolman, further undermining its confidence in him. Among other things, Setar discovered that:

>   (a)     Koolman directed an alarming 28% of Setar's procurement dollars to a number of vendors controlled by the Chong family between the years 2006 and 2012, in violation of Company policy;

(b)    Koolman did not disclose to Setar that he and his wife at the time, Defendant Debbie Koolman, were close personal friends of the Chong family, including Defendant G. Chong, in violation of Company policy;

(c)    Koolman repeatedly sent sensitive price information of other vendors to the Chong family companies, in violation of Company policy; and

(d)    Koolman lied to Company executives about Defendant 3DK, in violation of Company policy.

64.    Based on his lack of transparency and these violations of Company policies, Koolman was terminated for cause and instructed to return all Company property by the following day, August 16, 2016.

### Subsequent Discovery of a Kickback Scheme
### Involving Koolman and the Parker Defendants

65.    Soon after Koolman's termination, Setar's ongoing investigation revealed evidence of a kickback scheme involving Koolman and, among others, at least two Miami-based vendors of Setar: Defendants ITech and TTX.

66.    In particular, Setar discovered a portable thumb drive belonging to Koolman that contained an excel spreadsheet entitled "Copy of Biz Review 2010."

67.    Metadata indicates this spreadsheet was authored by an individual called "Max," likely a reference to Defendant Max Rivadeneira, who, as stated above, was a silent partner in TTX, a Defendant and Setar supplier from 2007 to 2011. Notably, Koolman is identified as the last person to edit this spreadsheet on April 14, 2011.

68.    Upon review, the spreadsheet is comprised of five different tabs, and shows total sales by quarter for the time period 2005 through 2010 from ITech and TTX to Setar.

69.    The spreadsheet indicates that from 2005 to March 15, 2010, Koolman oversaw or was involved in using ITech and TTX to defraud Setar out of more than $3 million.

70.     The spreadsheet specifically details these sales to Setar by date, invoice number, quantity, and make and model of the mobile equipment sold. It also lists information for each invoice, showing the cost of the equipment to Defendants ITech and TTX, and the price Setar paid for the equipment. A formula calculates the difference between the price Setar paid for the equipment and the cost to Defendants ITech and TTX, and refers to that difference as "GP"— *i.e.*, gross profit.

71.     According to the spreadsheet, the total gross profit, equating to approximately 20% of total sales to ITech and TTX, or $2.6 million, was split three ways between four individuals:

|   |   |   |
|---|---|---|
| a. | "Yvan": | 23% (totaling USD $592,000) |
| b. | "Dolores" and "Vilma": | 51% (totaling USD $1,347,000) |
| c. | Balance held in account: | 26% (totaling USD $666,000) |

72.      To no surprise, the invoices referenced in the spreadsheet match the numbers on actual Setar invoices from both ITech and TTX.

73.     The quantities, makes and models of mobile equipment listed in the spreadsheet also match the corresponding invoice.

**<u>Use of Parents to Disguise the Fraud</u>**

74.     "Dolores," referred to above in paragraph 71 (b), is a reference to Dolores Gonzalez, who also goes by the name Dolores Rivadeneira ("Dolores"). Dolores is Max Rivadeneira's mother, and a presumptive straw owner of ITech.

75.     "Vilma," referred to above in paragraph 71 (b), is a reference to a "Vilma Leandro Parker", Larry Parker's mother. Again, Setar suspects and alleges that "Vilma" is in truth Parker acting through his mother and using her as a straw person or nominee.

## Max Rivadeneira Confesses to the Fraudulent Kickback Scheme

76.     In December 2016, Rivadeneira was interviewed as part of Setar's ongoing investigation of Koolman's previous conduct. During that interview, Rivadeneira made, among others, the following statements and admissions:

a.  He and Parker formed ITech and TTX while they were still working for CT Miami (later known as CWW-USA).

b.  He and Parker placed their mothers as the owners of record on these two companies to keep a layer of protection, as they both had non-compete agreements with CT Miami.

c.  TTX was a vendor to Setar, and he personally oversaw the payment of kickbacks to Koolman.

d.  He sent $20,000 via wire transfer on a couple of occasions to a company controlled by Koolman. When presented with the name "3DK," he agreed that was the company to which he sent the two wire transfers. He confirmed that the payments made to Koolman through 3DK were wire transfers directly out of a TTX bank account.

e.  He was familiar with the spreadsheet Setar identified which detailed multiple payments to Koolman directly related to Setar purchases from ITech and TTX.

f.  His mother was in finance and she "handled it" (the spreadsheet).

g.  His mother is Dolores Gonzalez, and she was the legal owner of TTX.

h.  Parker brought this deal with Koolman to him, and "Larry devised the game plan or it might have been Yvan."

i.  Parker had given cash kickbacks to Koolman, too.

j.  Koolman on occasion would have ITech charge Setar a higher price than the market would otherwise bear.

## Koolman's Misappropriation of Setar's Funds

77.     According to the aforementioned spreadsheet, Koolman received cash, checks, charge card payments and wire transfers to 3DK, accumulating for himself, and at the expense of Setar, a sum total of $592,226 from sales to just two companies - ITech and TTX - over only a five (5) year period.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

78.     At times, Koolman sent payments from the illicit scheme to his then wife, Debbie Koolman. Specifically, between 2007 and 2010, Debbie Koolman appears to have received no less than $35,000 of the illegal kickbacks of money stolen from Setar.

79.     Other materials Setar discovered in the course of its investigation into the illicit scheme show that Defendant Aiza Croes received no less than $33,950 of these stolen funds from Koolman for "salary, rent, and cash" and that she spent no less than $32,935 on a combination of renovations to her home, utility bills, credit card balances, gas, car repairs, meals and other personal expenses.

80.     In sum, from 2006 to 2011, Setar purchased $15.2 million in mobile phones or devices from ITech and TTX, and Koolman led or oversaw the diversion of a 20% gross profit from these sales, totaling approximately $3 million (20% of $15.2 million).

### Continued Kickbacks with the Pinfu Defendants

81.     Setar's purchases from ITech and TTX declined significantly in 2010 and purchases from the Pinfu Defendants increased substantially in that same year.[3]

82.      Between 2006 and 2016, Setar purchased over $30 million in products from the Pinfu Defendant vendors. Upon information and belief, Koolman continued to divert 20% of the revenues from these purchases, amounting to approximately $6 million in additional Setar funds that Koolman converted to his own use or the use of others within his criminal enterprise.

---

[3] Defendant Rivadeneira's statements to Setar's representative seemed to corroborate this fact.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

**Koolman Fails to Disclose or Turns a Blind Eye Toward Product Issues**

83.     Koolman continued to purchase products from conspiratorial vendors that supplied inferior, often re-furbished and sometimes defective or virus/malware-ridden products to Setar.

84.     Koolman occasionally sought replacement units for the defective items, but never sought monetary credits from the suppliers in question—which were almost always one of the many Anti-Competitive Defendant/Racketeering Defendant vendors—nor did he cease doing business with the offending suppliers as he should have according to Setar's normal practices and protocols.

85.     By way of example, on August 1, 2014, Koolman emailed a representative of Smartone, stating he is attaching some of the EMEI numbers from the Samsung S4 phones that Setar received in June 2014. "We getting [sic] a lot of complains [sic] on the phones…and we did a checkup we notice that those phones are refurbished … Pls start looking with your supplier and see how we will fix this." Koolman copied no one at Setar and did not forward the email to anyone at Setar. A partially redacted copy of this email exchange is attached as **Exhibit A**.

86.     There is no record in Setar's files that Koolman ever received a response from Defendant Smartone on these product issues, nor are there records showing that Koolman sought to obtain a financial credit from Smartone on behalf of Setar. All that the records show is that four days later, on August 5, 2014, Koolman emailed Smartone asking the company to replace 12 S4 phones because of certain technical issues.

87.     A particularly egregious example of Koolman's misconduct concerning these product issues is shown by his December 8, 2015 email to G. Chow of Pinfu Group. Koolman writes, "I'm sending you this email because we are getting a lot of complain [sic] by the

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

customers that the Bird Z5 has porn apps on the phone…. This is given [sic] us a lot of problems and we are being treat [sic] by customer with the media. Or [sic] Director is so disappointed with this that he is evaluating to drop the Bird brand after so long that we are supporting the Bird brand." (Emphasis added). A copy of this email exchange is attached as **Exhibit B**.

88.     Despite the inclusion of pornography applications on the supposedly new phones sold to Setar by Defendant Pinfu Group, Koolman did not cease doing business with Defendant Pinfu Group after encountering these issues, nor did he ever seek a credit for these defective products on behalf of Setar.

**Koolman Causes Setar to
Pay Above Market Prices to Support and Conceal Kickbacks**

89.     To support and conceal the kickback and racketeering activities, Koolman, acting in concert with the Parker/Rivadeneira Defendants and Pinfu Defendants, routinely and systematically defrauded Setar into paying above-market prices for mobile phone equipment.

90.     In fact, on average, Koolman caused Setar to pay 20% above a given competitor's price.

91.     All competing supplier prices were emailed directly to Koolman.

92.     In most cases, Koolman was well aware of the lower competitor price because he often forwarded pricing and product information from non-conspiratorial vendors to conspiratorial vendors and his co-Defendants.

93.     For example, on August 31, 2006, Koolman received a price estimate from a non-conspiratorial vendor for the Nokia model 8800S phone of $603 or $736 per unit, depending on color. Later that same day, Koolman forwarded this price list to Overseas Trading. One month later, Koolman received an invoice from Overseas Trading dated September 5, 2006, and

20

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

reflecting Setar's order for 75 Nokia model 8800S phones for $1,110 per unit—51% higher than the non-conspiratorial vendor's earlier quoted price.

94.     Another instance occurred on August 9, 2010, when another non-conspiratorial vendor emailed Koolman indicating that she could provide Setar with the Nokia 7310 for $108 per unit. Koolman thereafter forwarded the non-conspiratorial vendor's email to Parker, stating, "You need to get this phone and with better price." Despite the non-conspiratorial vendor's confirmation in a subsequent email to Koolman that it could provide 100 units to Setar at a lower price, on September 1, 2010, Koolman placed a purchase order with Parker and ISky Wireless for the same phone and twice as many units (200), but at the significantly higher price of $142 per unit -- 39% higher, in fact, than the non-conspiratorial vendor's earlier quoted price. A partially redacted copy of this email exchange is attached as composite **Exhibit C**.

## Koolman Conceals Common Principals of Multiple Vendors

95.     Koolman was well aware that the vendors from whom he was procuring mobile phones and equipment were controlled and connected by the same group of common principals. Importantly, Koolman was also aware of Setar's policy to obtain a minimum of two price quotes from truly competitive and independently-operated vendors or suppliers.

96.      There are multiple communications from Koolman's email at Setar indicating his knowledge of Setar's policy and his attempts to work around it to his benefit and the benefit of the other Anti-Competitive and Racketeering Defendants.

97.     One such example occurred on May 16, 2007, when Koolman emailed a Miami phone supplier stating, "For 2007 SETAR has the policy that we need to buy from different source as much as possible. On pricing, much of the vendors in Miami are offering us the same price. Sometimes it vary [sic] but not much…. So each time **I'm splitting the order so**

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

**everybody gets some of the business**." (Emphasis added). This communication also exemplifies the lengths to which Koolman was willing to go to "rig" the purchase order/price quote process. A partially redacted copy of this email exchange is attached as **Exhibit D**.

98.     Another particularly stark example of Koolman's knowledge of common principles is shown in a 2011 email chain concerning a "new" vendor – Glisscom.

99.     On March 8, 2011, Koolman received an email from G. Chong (Glisscom@gmail.com) with a Glisscom invoice for a sample Huawei U8110 phone for Setar to test.

100.    On March 9, 2011, G. Chong sent Koolman a Glisscom new client registration form for Glisscom to become a supplier to Setar. G. Chong writes in Dutch to Koolman, "Enter this as completely as possible so that we can open a new account for you. Once this account is open, we can officially do business with each other." A copy of this email exchange is attached as **Exhibit E**.

101.    On April 11, 2011, G. Chong emailed Koolman a quote for various HTC, Samsung, Nokia and Huawei phones totaling $370,250.

102.    On April 13, 2011, Koolman emailed a Setar employee, indicating that Glisscom will be a *new* supplier to Setar and provides the contact details for Glisscom in the Netherlands. The details include the contact for Glisscom as a Jeanine Busropan in the Netherlands, not G. Chong.

103.    On April 18, 2011, Setar signed Glisscom's new client registration form, which Koolman then sent to G. Chong on April 19.  On the same day, Koolman sent Jeanine Busropan a Purchase Order signed by Setar for 100 HTC phones, 50 Nokia phones and 1000 Huawei

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

phones. The purchase order totaled $203,750.   G. Chong, also on the same day, emailed Koolman a Glisscom invoice.

104.   Leading up to and following the above transaction, Koolman never informed anyone at Setar that Glisscom was a company controlled or owned by G. Chong, who is also the main principal involved in Bengo Mobile, another Setar supplier.

### Use of Children and Fictitious Names to Further the Scheme and Enterprise

105.   Koolman and other Defendants went so far as to establish fictitious individuals and use children of related vendor principals to mask the common ownership of Anti-Competitive and Racketeering Defendant vendors.

106.   Email and other evidence suggests the following fictitious individuals and children were used as part of the Racketeering Defendants' criminal enterprise:

a.   **Steven Bradley** is believed to be a fictitious name used to hide the fact that Defendant Parker was the main principal behind Quantum Wireless;

b.   **Karina Hill** is believed to be a fictitious name used to hide the fact that Defendant Megan Lee was a principal of Bengo Mobile;

c.   **Clara Pratt** is believed to be a fictitious name used to hide the fact that Defendant Parker was a main principal at Pacific;

d.   **Tom Chen** is believed to be a fictitious name used to mask G. Chong and Megan Lee's affiliation with Fellow Trading and other companies; and

e.   **Yating Kao** is believed to be a pseudonym for an individual who was, at the relevant time, the *12-year-old* child of Megan Lee and Benny Wu.

### Koolman's Expenditures and Activities

107.   Koolman's emails reveal that he spent tens of thousands of US dollars on improvements to his residence in Aruba, including over $15,000 in renovations to his pool; the installation of over $15,000 in solar panels on his home; the purchase of over $10,000 in home appliances and furniture; and the purchase of a $10,000 pickup truck for his son. All or nearly all

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

of these purchases were made in Miami, and Koolman, to make matters worse, at times used Setar's freight forwarding vendors in South Florida (without Setar's knowledge) to move his improperly purchased goods to his home in Aruba.

108.   Koolman traveled regularly to Miami, made at least one trip to Panama, and traveled to Hong Kong, presumably to meet with members of the Pinfu Defendants, in 2006 and 2011.  In fact, in 2006 Koolman traveled to Hong Kong with M. Chong.

### Commercial Bribery

109.   As detailed above, since at least 2005, Koolman and the other Anti-Competitive Defendants, through their fraudulent system of kickbacks paid on manipulated bids for purchase orders, engaged in commercial bribery—*i.e.*, the Anti-Competitive Defendants specified above sent bribes to Koolman who, at the time, was an employee, agent and fiduciary of Setar.

110.   These bribes were sent to Koolman with the intent that they would influence and corrupt Koolman's decision-making on Setar's behalf in a way that gave an unfair competitive advantage to the Anti-Competitive Defendants and would directly harm Setar.

111.   These bribes were sent by the Anti-Competitive Defendants and accepted by Koolman and others without Setar's knowledge or consent.

112.   As a result of these bribes, Setar was obligated to pay more for the mobile phones and other mobile equipment it purchased from the Anti-Competitive Defendants than it would have had the market been truly "competitive," as Koolman led Setar to believe, and absent the illicit kickback and bribery scheme he engaged in with the other Anti-Competitive Defendants.

### Bid-Rigging and Price-Fixing

113.   As detailed above, since at least 2005, Koolman and the other Anti-Competitive Defendants, through their fraudulent system of kickbacks paid on manipulated bids for purchase

orders, entered into an illicit scheme that involved bid-rigging and price-fixing relating to the sale by certain of the Anti-Competitive Defendants and the purchase by Setar of mobile phones and other mobile phone equipment and accessories.

114.    This scheme of illegal bid-rigging and price-fixing unreasonably restrained competition and adversely affected interstate commerce in an illegal restraint of trade.

115.    As a result of this illicit scheme of bid-rigging and price-fixing, Setar was damaged in that it was unknowingly obligated by Koolman, acting in concert with the Pinfu Defendants and the Parker/Rivadeneira Defendants, to pay more for mobile phones and other mobile equipment than it would have in a truly competitive market and absent the bid-rigging and price-fixing scheme.

### The Racketeering Enterprise

116.    As detailed above, the Racketeering Defendants constitute a group of persons associated together for a common purpose of engaging in a course of conduct, as part of an ongoing organization, with the various associates functioning as a continuing unit. The Racketeering Defendants conspired to, and did, form an association-in-fact enterprise (the "Racketeering Enterprise").

117.    The Racketeering Enterprise had an ascertainable structure and organization existing apart from its predicate acts, and longevity sufficient to permit the associates of the enterprise to pursue its purpose.

118.    The Racketeering Enterprise has existed since at least 2005, and it has continuously and effectively carried out its purpose of the theft and diversion of funds from Setar to Koolman and the other Racketeering Defendants through a fraudulent system of kickbacks paid on manipulated bids for Setar's purchase orders to complicit suppliers of mobile equipment.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

119.     The purpose and the existence of the Racketeering Enterprise is proven by Setar's discovery of Koolman's long-standing kickback scheme involving the Parker Defendants and the suppliers they controlled; Koolman's repeated and continued procurement of mobile phones for Setar at significantly above-market prices; Koolman's concealment of performance and quality control issues with products sold by his Racketeering Defendant suppliers, including refurbished phones, defective phones, and phones infected with viruses, malware and pornography applications; Koolman's continued insistence on dealing with these vendors despite their product issues and his failure to seek credits on behalf of Setar for its payments for these defective phones; the Racketeering Defendants' use of fictitious names, names of elderly family members, and names of children to shield from Setar's discovery that they were owned by a group of related individuals; and Koolman's passing off of bids from those commonly-controlled suppliers as competitive, market-price bids from independent, competing suppliers. All of the above-conduct represents a continuing pattern of racketeering activity by, between and among the Racketeering Defendants over a period of years.

## Racketeering Activities

### Mail and Wire Fraud

120.     Each Racketeering Defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Racketeering Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of 18 U.S.C. §§ 1341 and 1343, involving the use of mail and wire communications in connection with a scheme to defraud. Each of the aforementioned illegal acts were conducted using interstate mails and/or wires, and thus affected interstate commerce and/or foreign commerce. More specifically, the Racketeering Defendants have made fraudulent statements or omitted materials facts they were under a duty to disclose in

connection with their scheme to defraud Setar or have otherwise used the interstate mails and/or wires in furtherance of their fraudulent Racketeering Enterprise.

**Travel Act Violations**

121.    Each Racketeering Defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Racketeering Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of 18 U.S.C. § 1952(a)(3) and (b)(2), involving travel in interstate or foreign commerce with the intent to commit bribery in connection with the kickbacks and the cell phone contracts on which they were paid, all in violation  of Section 838.015, Florida Statutes, which makes bribery a state law crime. More specifically, Defendant Koolman made dozens of trips to Miami to meet with various of the Parker/Rivadeneira Defendants, made at least one trip to Panama to undertake banking activity in interstate or foreign commerce in connection with his "pay to play" kickback scheme with the other Racketeering Defendants, and traveled to Hong Kong, presumably to meet with members of the Pinfu Defendants, in particular Defendant G. Chong and his wife, in 2006 and 2011.

**COUNT I:**
**COMMERICAL BRIBERY: VIOLATION OF ROBINSON-PATMAN ACT**
(Against Anti-Competitive Defendants)

122.    Plaintiff re-alleges and incorporates paragraphs 1 through 115.

123.    This is an action for violations of 15 U.S.C. 13(c), the Robinson-Patman Act, brought pursuant to 15 U.S.C. 15(a), the Clayton Act.

124.    Setar, as detailed above, is a participant in the domestic market as a purchaser of cellular telephone and other mobile equipment and accessories from various vendors and suppliers located or operating, directly or indirectly through affiliated companies, within the United States and specifically the State of Florida.

BROAD AND CASSEL LLP
One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

125.    Since at least 2005, as more extensively detailed above, Koolman and the other Anti-Competitive Defendants, through their fraudulent system of kickbacks paid on manipulated bids for purchase orders, engaged in commercial bribery—*i.e.*, the Anti-Competitive Defendants sent bribes to Koolman who, at the time, was an employee, agent and fiduciary of Setar.

126.    These bribes were sent to Koolman with the intent that they would influence and corrupt Koolman's decision-making on Setar's behalf in a way that gave an unfair competitive advantage to the Anti-Competitive Defendants and would directly harm Setar.

127.    These bribes were sent by the Anti-Competitive Defendants and accepted by Koolman and others without Setar's knowledge or consent.

128.    Federal law proscribes the illicit commercial bribery scheme in which the Anti-Competitive Defendants engaged.

129.    As a result of this scheme of commercial bribery, Setar was obligated to pay more for the mobile phones and other mobile equipment it purchased from the Anti-Competitive Defendants than it would have had the market been truly "competitive," as Koolman led Setar to believe, and absent the illicit kickback and commercial bribery scheme he engaged in with the other Anti-Competitive Defendants.

**WHEREFORE**, Plaintiff demands judgment in its favor and against the Defendants for all actual and consequential damages arising from the Defendants' anti-competitive conduct, including treble damages, an award of costs and all reasonable attorneys' fees pursuant to 15 U.S.C. § 15(a), and any other further relief the Court deems just and proper.

## COUNT II:
## BID-RIGGING AND PRICE-FIXING: VIOLATION OF SHERMAN ACT
(Against Anti-Competitive Defendants)

130.    Plaintiff re-alleges and incorporates paragraphs 1 through 115.

131.   This is an action for violations of 15 U.S.C. 15(a), the Sherman Act, brought pursuant to 15 U.S.C. 15(a), the Clayton Act.

132.   Setar, as detailed above, is a participant in the domestic market as a purchaser of cellular telephone and other mobile equipment and accessories from various vendors and suppliers located or operating, directly or indirectly through affiliated companies, within the United States and specifically the State of Florida.

133.   As further detailed above, since at least 2005, Koolman and the other Anti-Competitive Defendants, through their fraudulent system of kickbacks paid on manipulated bids for purchase orders, entered into an illicit scheme that involved bid-rigging and price-fixing relating to the sale by certain of the Anti-Competitive Defendants and the purchase by Setar of mobile phones and other mobile phone equipment and accessories.

134.   This scheme of illegal bid-rigging and price-fixing unreasonably restrained competition and adversely affected interstate commerce in an illegal restraint of trade.

135.   The Anti-Competitive Defendants, as alleged above, are comprised of a combination of different individuals and distinct business entities.

136.   The Anti-Competitive Defendants intended to harm Setar, restrain trade, and injure commerce and the competitive process through the use of the bid-rigging and price-fixing scheme at issue in this dispute.

137.   As a result of this illicit scheme of bid-rigging and price-fixing, Setar and competition were actually damaged in that Setar was unknowingly obligated by Koolman, acting in concert with the other Anti-Competitive Defendants, to pay more for mobile phones and other mobile equipment than it would have in a truly competitive market and absent the bid-rigging and price fixing-scheme.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

**WHEREFORE**, Plaintiff demands judgment in its favor and against the Defendants for all actual and consequential damages arising from the Defendants' anti-competitive conduct, including treble damages, an award of costs and all reasonable attorneys' fees pursuant to 15 U.S.C. § 15(a), and any other further relief the Court deems just and proper.

## COUNT III:
## CIVIL RICO: VIOLATION OF 18 U.S.C. § 1962(c)
(Against Racketeering Defendants)

138.    Plaintiff re-alleges and incorporates paragraphs 1 through 108, and 116 through 121.

139.    This is an action for violations of 18 U.S.C. § 1963(c).

140.    The Racketeering Defendants are each a "person," as defined by 18 U.S.C. § § 1961(c) and 1964(c).

141.    All Racketeering Defendants formed an association-in-fact "enterprise," as defined by 18 U.S.C. § 1961(4).

142.    The members of the Racketeering Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the enterprise's purpose. The Racketeering Defendants forged symbiotic relationships and each Racketeering Defendant needed and depended upon the participation of the other Racketeering Defendants to accomplish their common purpose: *i.e.*, willingly and intentionally diverting kickbacks and obtaining compensation, revenues and profits on mobile phone equipment purchase contracts that were illegally obtained through a pattern of racketeering activity consisting of various and repeated materially false and fraudulent representations and omissions spanning a more than ten-year period, all in violation of 18 U.S.C. § 1962(c).

BROAD AND CASSEL LLP
One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

143.     Each Racketeering Defendant has willingly or knowingly conducted and/or participated, directly or indirectly, in the conduct of the Racketeering Enterprise's affairs through a "pattern of racketeering activity" from 2005 through 2016, as defined by 18 U.S.C. § § 1961(1) and 1961(5) and consisting of:

> a) Violations of 18 U.S.C. § § 1341 and 1343, involving the use of mail and wire communications in connection with their scheme to defraud Setar; and
>
> b) Violations of 18 U.S.C. § 1952(a)(3) and (b)(2), involving travel in interstate or foreign commerce with the intent to commit bribery in connection with the kickbacks and the cell phone contracts on which they were paid, all in violation of Section 838.015, Florida Statutes, which makes Bribery a state law crime.

144.     The members of the Racketeering Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the enterprise's purpose. The Racketeering Defendants forged symbiotic relationships and each Racketeering Defendant needed and depended upon the participation of the other Racketeering Defendants to accomplish their common purpose of defrauding Setar.

145.     Setar has been injured in its business and property by reason of the Racketeering Defendants' conduct described above, as well as its having been forced to incur significant legal fees and related costs in its attempt to address the Racketeering Defendants' misconduct and stem the tide of economic damages such misconduct has caused.

146.     As detailed above, the Racketeering Enterprise was engaged in or affects foreign and interstate commerce.

147.     The scheme has occurred over a series of predicate acts and over a number of years sufficient to rise to the level of a RICO enterprise.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

148.   The Racketeering Defendants' scheme is the legal and proximate cause of the damages Plaintiff seeks to recover by means of this action.

**WHEREFORE**, Plaintiff demands judgment in its favor and against the Racketeering Defendants for all actual and consequential damages arising from the Racketeering Defendants' conduct, including treble damages, an award of costs and all reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other further relief the Court deems just and proper.

**COUNT IV:**
**CIVIL RICO CONSPIRACY: VIOLATION OF 18 U.S.C. § 1962(d)**
(Against the Racketeering Defendants)

149.   Plaintiff re-alleges and incorporates paragraphs 1 through 108, and 116 through 121.

150.   This is a claim for violations of 18 U.S.C. § 1962(d) against the Racketeering Defendants.

151.   The Racketeering Defendants formed an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

152.   The Racketeering Defendants have willfully combined, conspired and agreed to conduct and/or participate, directly or indirectly, in the conduct of the Racketeering Enterprise's affairs through a pattern of racketeering activity, consisting of:

> a) Violations of 18 U.S.C. § § 1341 and 1343, involving the use of mail and wire communications in connection with their scheme to defraud Setar; and
>
> b) Violations of 18 U.S.C. § 1952(a)(3) and (b)(2), involving travel in interstate or foreign commerce with the intent to commit bribery in connection with the kickbacks and the cell phone contracts on which they were paid, all in violation of Section 838.015, Florida Statutes, which makes Bribery a state law crime.

BROAD AND CASSEL LLP
One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

153.     Each Racketeering Defendant knew of, agreed to and acted in furtherance of the overall objective of the conspiracy by engaging in and/or facilitating the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(d).

154.     Setar has been injured in its business and property by reason of the Racketeering Defendants' above-described conspiratorial conduct.

**WHEREFORE**, Plaintiff demands judgment in its favor and against the Racketeering Defendants for all actual and consequential damages arising from the Racketeering Defendants' conduct, including treble damages, an award of costs and all reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other further relief the Court deems just and proper.

**COUNT V:**
**FRAUDULENT MISREPRESENTATION**
(Against Koolman)

155.     Plaintiff re-alleges and incorporates paragraphs 1 through 121.

156.     This is an action for fraudulent misrepresentation against Defendant Koolman.

157.     As outlined above, Koolman made various misrepresentations of material fact and omitted other material facts he was under a duty to disclose to Setar, as his employer, concerning the nature of his business dealings with his co-Defendants and suppliers of Setar.

158.     Koolman knew these misrepresentations were false at the time they were made and was aware that his omissions of other material facts left Setar with a false impression of the true state of affairs concerning Koolman's business dealings with his co-Defendants and Setar's suppliers.

159.     By making these false representations of material fact and by failing to disclose or omitting other facts he knew to be material, Koolman intended that Setar would rely on those misrepresentations and omissions to enter into purchase order agreements with his co-

33

**BROAD AND CASSEL LLP**
One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

Defendants—suppliers who Koolman knew would handily compensate him for procuring the contract in the form of the kickbacks at issue in this dispute.

160.     Setar relied to its detriment on Koolman's misrepresentations and omissions concerning these material facts by dealing with Koolman's co-Defendants and purchasing, at times, inferior, defective and compromised mobile phone equipment from them.

161.     Setar has been and continues to be damaged as a direct and proximate result of its reliance on Koolman's intentional misrepresentations and omissions of material fact.

**WHEREFORE**, Plaintiff demands judgment against Koolman for actual and consequential damages in an amount to be proven at trial, awarding Plaintiff prejudgment interest and its reasonable attorneys' fees and costs incurred in this action, and granting to Plaintiff any such other relief that the Court deems just and proper.

## COUNT VI:
## BREACH OF FIDUCIARY DUTY
(Against Koolman)

162.     Plaintiff re-alleges and incorporates paragraphs 121.

163.     This is an action for breach of fiduciary duty against Koolman.

164.     Setar placed its faith, trust and confidence in Koolman to perform his duties as Product Manager in charge of procurement for the Company in good faith and in the best interests of the Company.

165.     Koolman accepted his position of trust and confidence and assumed the duty to act at all times with the utmost duty of loyalty and care toward Setar in the performance of his job functions.

166.     Setar was reasonable to place its trust and confidence in Koolman to do so.

167.    Having accepted this position of trust and confidence, Koolman owed Setar fiduciary duties to act in a fair, honest, just, trustworthy and equitable manner and to act in furtherance of the Company's best interests.

168.    Koolman breached his fiduciary duties owed to the Company by, as detailed above, defrauding the Company and engaging in a more than decade long scheme of fraud, deceit and unscrupulous self-dealing designed to enrich himself and those around him at the expense and to the great detriment of the Company. Koolman, in simple point of fact, put his own interests ahead of the Company's. In so doing, he violated the fiduciary duties he owed to Setar.

169.    Setar has been damaged as a direct and proximate result of Koolman's breaches of his fiduciary duties as stated herein.

**WHEREFORE**, Plaintiff demands judgment against Koolman for actual and consequential damages in an amount to be proven at trial, awarding Plaintiff prejudgment interest and its reasonable attorneys' fees and costs incurred in this action, and granting to Plaintiff any such other relief that the Court deems just and proper.

**COUNT VII:**
**CONVERSION**
(Against Koolman)

170.    Plaintiff re-alleges and incorporates paragraphs 121.

171.    This is an action for conversion against Koolman.

172.    As detailed above, from 2005 through 2016, Koolman converted to his own use funds in excess of $5 million that were rightfully the property or an opportunity of Setar.

173.    Setar has been damaged as a direct and proximate result of Koolman's conversion of its property.

35

**WHEREFORE**, Plaintiff demands judgment against Koolman for actual and consequential damages in an amount to be proven at trial, awarding Plaintiff prejudgment interest and its reasonable attorneys' fees and costs incurred in this action, and granting to Plaintiff any such other relief that the Court deems just and proper.

## COUNT VIII:
## CIVIL THEFT, § § 772.11 AND 812.014, FLORIDA STATUTES
### (Against Koolman)

174.     Plaintiff re-alleges and incorporates paragraphs 1 through 121.

175.     This is an action against Koolman for civil theft pursuant to § § 772.11 and 812.014, Florida Statutes.

176.     As detailed above, Koolman knowingly and with criminal intent obtained, used or endeavored to obtain or to use the property of Setar with the intent to permanently deprive Setar of a right to or a benefit from its property, or appropriate the property to his own use under circumstances in which he was not entitled to the use of the property.

177.     Setar has been damaged as a direct and proximate result of Koolman's theft of its property.

**WHEREFORE**, Plaintiff demands judgment against Koolman for actual and consequential damages in an amount to be proven at trial, including treble damages, awarding Plaintiff prejudgment interest and its reasonable attorneys' fees and costs incurred in this action, and granting to Plaintiff any such other relief that the Court deems just and proper.

## COUNT IX:
## AIDING AND ABETTING
### (Against the Defendants)

178.     Plaintiff re-alleges and incorporates paragraphs 1 through 121, 156 through 161, 163 through 169, 171 through 173, and 175 through 177.

BROAD AND CASSEL LLP
One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

179.    This is a cause of action against the Defendants for aiding and abetting Koolman's tortious conduct.

180.    Each of the Defendants was aware of Koolman's breaches of his fiduciary duties owed to Setar, his misrepresentations and omissions to Setar, and his conversion and theft of Setar's funds.

181.    Each of the Defendants encouraged or provided Koolman with substantial assistance in breaching his fiduciary duties to Setar, his fraudulent misrepresentations and omissions to Setar, and his conversion and civil theft of Setar's funds.

182.    More specifically, the Defendants offered Koolman encouragement and substantial assistance by willingly and intentionally diverting kickbacks and obtaining compensation, revenues and profits on mobile phone equipment purchase contracts that were illegally obtained through various and repeated materially false and fraudulent representations and omissions spanning a more than ten-year period in which the Defendants engaged.

183.    As a result of the Defendants' having given substantial aid and assistance or their otherwise having encouraged Koolman in carrying out his scheme to defraud Setar, Setar has been damaged and continues to be damaged.

**WHEREFORE**, Plaintiff demands judgment against all Defendants for actual and consequential damages in an amount to be proven at trial, awarding Plaintiff prejudgment interest and its reasonable attorneys' fees and costs incurred in this action, and granting to Plaintiff any such other relief that the Court deems just and proper.

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

## COUNT X:
## CIVIL CONSPIRACY
### (Against the Defendants)

184.    Plaintiff re-alleges and incorporates paragraphs 1 through 121, 156 through 161, 163 through 169, 171 through 173, and 175 through 177, and 179 through 183.

185.    This is a cause of action for conspiracy against the Defendants.

186.    The Defendants, as detailed above, agreed and conspired to perform an unlawful act or a lawful act by illegal means—*i.e.*, willingly and intentionally diverting kickbacks and obtaining compensation, revenues and profits on mobile phone equipment purchase contracts that were illegally obtained through various and repeated materially false and fraudulent representations and omissions spanning a more than ten-year period and their knowing and willing participation, direct or indirect, in Koolman's acts of fraudulent misrepresentation, breach of fiduciary duty, conversion and civil theft of funds with respect to his long-term employer, Setar.

187.    As detailed above, each Defendant performed one or more overt acts in furtherance or pursuance of this illicit conspiracy to defraud Setar.

188.    Setar was damaged and continues to be damaged as a direct and proximate result of the Defendants' conspiracy.

**WHEREFORE**, Plaintiff demands judgment against all Defendants for actual and consequential damages in an amount to be proven at trial, awarding Plaintiff prejudgment interest and its reasonable attorneys' fees and costs incurred in this action, and granting to Plaintiff any such other relief that the Court deems just and proper.

BROAD AND CASSEL LLP
One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400

## Demand for Jury Trial

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Setar N.V.

requests a trial by jury in this matter.

Dated this 3rd day of March, 2017.

Respectfully submitted,

/s/ Benton Curtis
Benton Curtis, Esq. (118156)
bcurtis@broadandcassel.com
Shane P. Martin, Esq. (373397)
smartin@broadandcassel.com
Jonathan Etra (686905)
jetra@broadandcassel.com
**BROAD AND CASSEL LLP**
2 South Biscayne Boulevard, 21st Floor
Miami, Florida  33131
Telephone: 305.373.9400
Facsimile:  305.373.9443
*Attorneys for Plaintiff Setar N.V.*

BROAD AND CASSEL LLP

One Biscayne Tower, 21st Floor, 2 South Biscayne Blvd., Miami, Florida 33131-1811 305.373.9400